The Honorable Susan F. Hutchinson is presiding. And we're still good morning. Please be seated. Your Honor, the final case on the docket this morning is 2-22-0422, integrating the Commitment of Chad Wahl. The people of the state of Illinois petitioner at the lead, being Chad Wahl, respondent appellate. Arguing on behalf of the appellate, Mr. Michael R. Johnson. Arguing on behalf of the appellate, Mr. Nicholas Gold. All right. All right, Mr. Johnson, you may proceed. Thank you. May it please the Court. Counsel. Forty-five years ago, the United States Supreme Court considered a civil commitment case and determined that because of the infallibility and the lack of certainty in psychology and psychiatry, that it found that it would be a rare case that the state could meet its burden of proof beyond a reasonable doubt that someone was both mentally ill and dangerous. And as a result, they held that the Constitution did not require it. However, the Illinois legislature has required it in Illinois Sexually Violent Persons Commitment Act cases like this one, and that is indeed the tall, high burden that the state had to meet. I'd like to focus on the three related issues in our brief where the state failed to meet its burden of proof because, first, the state's experts failed to consider an essential fact. Second, the state failed to prove the mental disorder element. And third, the state failed to prove the substantial probability element. Substantial probability of what? Engaging in acts of sexual violence. In the future? Yes. Didn't your client basically give him a roadmap as to what he was going to do in the future? Well, no. No? No. In fact, the state never proved any of those statements. They never proved any of the letters. They never proved any of that. They introduced it as basis of opinion testimony, but they failed to prove that any of that was substantively true. They could have called in witnesses to prove that, presumably. They could have called in witnesses from the Department of Corrections who had reviewed mail and laid a foundation to have this evidence introduced, and they never did that. They even got a second bite at the apple because Mr. Wall testified at the trial, and they failed to cross-examine him on the specificity of any of the letters, any of the books, any of the evidence that they tried to use as a basis of opinion. What would they have to prove? Well, in order to rely on those things, actually, well, they introduced it as basis of opinion testimony, which cannot be considered for the truth of the matter asserted. They did not introduce it as substantive evidence. They did not lay a foundation to show that he actually wrote those letters. They did not lay a foundation to show that he actually ordered any of the books. None of that stuff was proven substantively true, and they had the burden of proof beyond a reasonable doubt. But there was proof that those things were taken either from his possession or through the prison, I guess, through the prison mail or whatever the circumstance was that the letters went either through or into the prison mail system. I disagree. Presumably, they could have presented that evidence if they would have called witnesses to establish that, but they only called two psychologists who reviewed these materials. Well, how did the psychologists get that information and got the documents because they saw them? Well, the records, I think the testimony showed that they received the records from Wexford, the company that, or the Department of Corrections, who has a contract with Wexford, and the Department of Human Services then provided the records to Dr. Smith. Okay. But there's no question that the psychiatrists reviewed those and used them in their professional opinions to testify or their reports were introduced as their assessment of Mr. Wall. I would agree with that. Okay. Yes. And that, with all due respect, Counsel, it's pretty strong evidence about this person. Well, I disagree. And one of the things that we've argued in our brief is that the experts completely failed to consider the 14-month period where he was released armband and he was never arrested or charged or accused of any sexual offense. And how do we know that he never was? Well, if he was arrested or accused or charged, there would have been a record of that that would have come out at the trial, first of all. Second of all, he testified that he was armband and the state never offered any sort of rebuttal evidence to prove that that was not true. And maybe, I hesitate to say this, but I've dealt with a lot of children in my judicial career. Maybe you just didn't get caught, is what I used to say in juvenile court. And maybe Mr. Wall was not apprehended during this 14-month period. The 14-month period was subsequent, extremely earlier on, subsequent to when they discovered all of this information in his jail cell and that was given to a psychiatrist, correct? No. According to the records, yes. I mean, the timeline, yes. Yes. I don't, well, first of all, to come back to Justice Hutchinson's question, there was no evidence at all that he, I mean, the state had the burden of proof. We can't, I don't think we can speculate that he might have engaged in... Did the state have someone living with Mr. Wall for the 14 months between when he was charged and when he was convicted? No. No. He had, he was armband. Yes. He had certain bond conditions and they're probably rather standard bond conditions. Don't commit any offenses. Don't leave the state without permission. You know, visit with your probation officer. Maybe there were some others. Maybe see a counselor. We don't particularly know that because that's not part of this record. Right. But he was armband and he was not on 24-hour surveillance. He wasn't on a leg bracelet because I don't think they existed back in those days. He wasn't on house arrest. So how do we know he didn't? Well, first of all, because he testified that he did not and there was no other evidence introduced to say that he did engage in those acts. But one of the tests that was employed in this case, and you have argued to it, talks about he's low on this scale. And one of the doctors said, well, the scale doesn't mean he's not going to recommit. It means that it's not likely he will be apprehended or caught or found doing these things. So, you know, that applies to that 14 months as well, doesn't it? Well, it's true to a certain degree that if somebody is not detected, that you can't measure it. True. The state had the burden of proving it beyond a reasonable doubt that he was substantially probable. And it cannot rely on this idea that we just don't know. And that's not proof beyond a reasonable doubt. With respect to the actuarial instruments, they showed that there was quite a low recidivism rate associated with his score of two. Turning back to the second issue that we've raised, which is that the state failed to prove the mental disorder element, this argument relies on the Illinois Supreme Court decision from Murray where the defendant in that case was charged with possession of a firearm by a street gang member. And in an effort to try and prove that he was a member of a street gang, they brought in a detective who testified to the definition of what a street gang was under the statute and that, yes, the Latin Kings was a street gang that met that definition. And that is precisely the same. Well, that was held to be insufficient as proof beyond a reasonable doubt. And that is precisely the same type of testimony that was given in this case when the state asked both of its experts, is the mental disorder that you've diagnosed a congenital or acquired condition? Yes. Is it affecting his emotional or volitional capacity? Yes. Does it predispose him to engage in acts of sexual violence? Yes. And they never offered any explanation sufficient under Murray to be able to prove the mental disorder element beyond a reasonable doubt. What other, what should they have presented? Pedophilia is recognized as a, or not otherwise specified, or however that last little term is, it's identified in the premier document, the DSM volumes, that is used by this court, by the Supreme Court, by anybody dealing in this area. It's a mental disorder. So what more did they have to prove? Well, it's true that the diagnosis of pedophilic disorder is in the DSM. But the testimony at the trial established that a DSM diagnosis was not the same as the statutory definition of mental disorder, that the two things were not equal, and that a DSM diagnosis does not necessarily mean that someone's going to act on their behavior or that it causes a certain behavior, whereas the statute specifically required an effect on the emotional or volitional control and a predisposition to engage in acts of sexual violence. The materials reviewed by both doctors that occurred, that they reviewed during the course of their examinations, certainly are pretty significant, talking about things that he's done, he wants to do, where he wants to go, what he thinks will be the best, and talking about his history with his father. I mean, why is that not sufficient proof? Because they never incorporated that into their testimony, that this met the definition of a mental disorder under the SVP Act. They never tied that together. They put that as part of their diagnosis for pedophilic disorder, not as part of any explanation for why he met the mental disorder element. And that was a failure of proof. The mental disorder element. I'm not sure, again, what that means. Well, under Section 5 of the statute, the term mental disorder is defined as a congenital or acquired condition affecting the emotional or volitional capacity, predisposing a person to engage in acts of sexual violence. Does one or the other make a difference if it's congenital or acquired? It doesn't make a difference, does it? There's no distinction between them. They're both violent, and they're both dangerous. Well, if you're saying, if you're taking it from that perspective, then yes. But we've argued in our brief, and we maintain today, that just saying it's congenital or acquired ignores a third thing, which is that he did not have the disorder at all. His father died in prison after filming pornography, of which this young man, now he's no longer a young man, but this man was his primary actor. That could be either acquired or congenital. And even if we set aside the acquired or congenital issue, we still have whether it affects the emotional or volitional capacity and predisposes Mr. Wall to engage in future acts. Why does he want to go to Morocco? Or you don't think that he wants to go to Morocco? Well, the state did not prove that to be true, but looking at the other testimony from the trial, Dr. Walden-Padera acknowledged that his plans were hopes and wishes and that they were impossible. The idea that he could travel to Morocco and set all this up while he's been convicted of a sex offense and he was going to have restrictions on his travel, is he going to be able to get a passport? I mean, the idea that these are things that could actually happen, that he could actually do, it was recognized at the trial that these were impossible. So what you have is somebody, in the best case scenario for the state, writing letters who's, as he said during the trial, he's writing whoever he can get his hands on. And that was the testimony, I believe, from Mr. Wall. But why? I mean, he could have just as easily written that he wanted to get out to see the flowers in spring. Those were not issues he raised. He raised issues related to his previous offense, for which he spent significant time in prison. That is what the basis of the opinion showed, but the state never actually proved those to be true. With respect to the risk, we have a similar analysis here to the decision of in re-commitment of McCormick, where the appellate court reversed the trial court's decision and held that the proof was failed to meet the burden of proof beyond a reasonable doubt. In McCormick, the respondent had been a priest who had engaged in behaviors with children. He had a similar score on the static 99R. He had similar risk percentages on the static 99R to Mr. Wall, and that the court then considered the presence or absence of these dynamic risk factors. And for the reasons that we've described in our brief, the state failed to prove that those risk factors raised the risk to substantial probability. I would also point out that there was a failure in the process by the state's witnesses, particularly where Dr. Weldon-Padera identified the risk factor of poor problem solving because she found that it was unknown whether he has the capacity to identify what his real issues and problems are and whether he has the skills or knowledge to work on those things. So that standard flipped the burden of proof on its head by assigning him a risk factor when she said that it was unknown, and that was the type of process that they used in this case to commit Mr. Wall. All right. When she tendered her assessment, she listed a series of factors as to why she believed the defendant would re-offend or would sexually act out with children, and she included his ongoing desire for sexual abuse of children, his explicit plan to sexually abuse children, his lack of skills to maintain healthy relationships, which is I think what you just essentially mentioned, his emotional identification with children rather than adults, his lack of concern for others, his lack of empathy for his victims, calling himself in the earlier cases he was the victim, they were the parties he offended against him, poor problem solving skills, viewing himself as the victim, preoccupation with sex, deviant sexual interest in children, attempts to evade authority, and refusal to participate in sex offender's treatment, and his belief that sexual abuse of children is positive and acceptable. How many more would you have wanted her to list? Well, it's not about the quantity. It's about the number of them, but it's about what effect do they have on the risk, and when you start with the static 99R of 12.2 to 19.7%, does it get to substantial probability? They could not quantify any of the risk factors, just as in McCormick where the appellate court held that it was insufficient. So a reasonable person would not look at that and say, wow, this person should not be allowed to be out of containment. Not when you look and take, not the kind of review that the state wants you to do where you completely defer to the expert, but the kind of review that was done in McCormick where we recognize that this is not a conclusive science, it's not a conclusive determination, and we see the lack of any sort of investigation. But in McCormick, there had been no previous offense for which he had been found guilty that they could refer back to. In this case, there's no question there is a previous offense which they are referring back to. When he was sentenced to, excuse me, in 1994. McCormick had several, he had at least five convictions. Well, he had much that came up. This is not the same type of case as McCormick. Well, I disagree. The McCormick case, the respondent, the appellate court opinion is light on details of what he was convicted of because they say that the parties agree that he is convicted of a sexual offense. But I'm sure you know by now, Counsel, that I wrote the initial decision in Chad Wall. And if you don't, you didn't do your homework. I read that whole record start to finish, and back in 1994-95, I wrote that opinion. I am very aware of what he was convicted of. Well, for the reasons in our brief, we ask that the court reverse the trial court. Thank you. Thank you. You'll have an opportunity to reply, Counselor. All right. Mr. Is it Mueller or Mueller? Mueller. Mueller. Okay. And I think you're going to have to pull the microphone down a tad. Just a bit. May it please the Court, Counsel, my name is Nick Mueller on behalf of the people. I think the first thing I'd like to go over is what the standard is here today because there was a point where Counsel said even if we take the evidence, best case scenario for the state. And the thing is that is the standard. That is the way we have to take the evidence. All evidence and all reasonable inferences have to be made in favor of the state. And that lends to the ultimate question of could a rational fact finder reasonably believe the two unrebutted state experts that said the respondent has a pedophilic disorder and that that disorder makes him substantially likely to commit further acts of sexual violence. It's particularly reasonable for someone to come to that finding because those experts relied on respondent's own admissions, both that he had these intense desires for children and he had several plans to further commit acts of sexual violence. How do you respond to his argument that those records or those letters, books, et cetera, that there was no foundation laid for those to be admitted into evidence? There's several answers to that, Your Honor. The first being the respondent admitted to writing the letters in his testimony on cross-examination. So the argument that the state did not use cross-examination is just incorrect. The state didn't go through letter by letter but asked Mr. Wall on the stand and he admitted to writing the letters, nor did he ever put forward any denial of doing the letters. And before trial, he admitted to writing the letters in pretrial litigation because he tried to get them suppressed, not because they weren't authentic, but because he felt the state was violating his privacy for taking his personal letters. So the reason the state never went through and proved the foundation for these letters is there was no objection to prompt it, it was never an issue because it was admitted, and it's not an element of what the state was required to prove. Did he ever admit his, there's something about him attempting to author a book. Did he ever admit to doing that? I do not know if there was a specific admission, Your Honor, but there was no denial. And it all comes back to the foundational question of what was the state required to prove. The state is not required to prove substantive evidence, or not required to prove for substantive truth. The evidence relied upon the experts. The evidence rules say that. And in these SVP cases, many times the state tries to use that as substantive evidence, or tries to put it in as substantive evidence, excuse me. It's bad because it's too prejudicial against the respondent. The question, as courts have frequently said, in these cases comes down to what do the experts think. Their opinion is the ultimate evidence, and this evidence only comes in to judge whether that opinion is reliable. And in this case, even beyond those letters, there was so much more. There were the acts he committed. There was his lack of empathy. There was his statement to, excuse me, Dr. Robin Thera, in the investigation, in which he came off as KG, and clearly acting out the plan. KG, I should say for, I don't believe KG is the term used in the record, but it was, he clearly seemed to be faking his answers. And that goes to the letters, too, that he said, because he said, I'm going to lie. I'm going to find my way to fake my way out of this SVP process. So the letters alone make the jury's finding that respondent was an SVP reliable, or that the expert's opinion was reliable, make that a reasonable finding. But they're not all there is. Going on to this question of, well, doesn't the 14-month period make this go away? That, again, has multiple answers. One, all we have about that 14-month period is a respondent who has already written out, I'm going to lie and do everything I can not to be found in SVP, himself saying, I didn't get into trouble. How many years ago was that 14-month period? That 14-month period, I believe, would have been 1994. It's the period between when he was charged and when he actually was convicted. So I don't, 94 or 95, you're on. So in one instance, one side of it is bookending that period of not being caught for doing anything. You have him joining an orphanage to work, to have access, and then sexually abusing multiple boys multiple times in terrible ways. After that period, you have him writing throughout prison, and though he knows that he has to be careful, he says, I don't want to get caught in SVP. He can't stop himself from writing these letters, saying all these things that are supporting the expert's diagnosis. So clearly he does not have control, even if there was that 14-month period where he wasn't caught for anything, or at the very least, even if he didn't commit offenses. That's not what underlies a pedophilia diagnosis, as the doctors testified to. It's not just acts of violence. It's the thoughts, feelings, and beliefs and desires if they cause distress for an individual. And in this case, he clearly has had those thoughts and desires for a long time. Again, and there's been no expert testimony that has said this 14-month period is crucial. There are experts that have said, yep, you know what, that defeats pedophilia diagnosis. And that's a problem, because all we have are the expert's testimony at trial to say what a pedophilia diagnosis is. Respondent could have put forth his own experts if he wished to make this argument. In fact, he had two separate experts examine him prior to trial, but chose not to present them. A sufficiency case is not an opportunity to commit cross-examination on appeal. It's not an opportunity to get a second chance at a closing argument on appeal. The question is, was what the state put forward enough? And here it was. I'd like to address first the sense that the experts didn't explain their questions or that they gave summary answers. Yes, at the end of their testimony, the experts were asked concluding summary questions and gave concluding summary answers. That's because they had just spent their entire testimony going through the reasons and explanations for those findings. That's just what happens with summary questions. That's how you finish an examination. You ask for their conclusion, having gotten all their reasons, and then you move on. This case is not like McCormick, because McCormick, for one, did not have an admission by the respondent that he was going to go out and do these acts of violence again. McCormick had a trial judge relying on a factor against respondent that the expert had explicitly said could not be used against respondent and moving beyond factual distinction. McCormick is non-presidential, and it's an outlier. Almost every other court to look at sufficiency challenges says you cannot go through factor by factor and pick apart an expert's testimony that way. The question is to look at all the evidence and to apply the heavily deferential standard of taking all evidence in the light most favorable to the state. And as for Murray, because McCormick took from Murray the question of explanation, Murray was not an SVP case. Murray is not this case. In Murray, a police, I believe, officer or detective testified without explanation that the Latin Kings were a street gang without going into any of the factors in the statute. That's not what happened here. Here we have medically trained experts who explained why they were experts, what training they had, and what expertise they were using in coming to their conclusions. Murray just does not apply in this case. So unless there are... Did either doctor indicate that even though he did not want to participate, I guess, in any programs that were offered, that he received any sort of counseling for this particular disorder? My understanding is that there was no treatment. There was no sexual offender treatment in IDOC. There may have been some other classes, notably actually weighing against respondent. He tried to take a parenting class despite the fact that he has no children. He may have taken other classes. But as to sexual offender treatment, the doctor said no, and that is another factor against him, and it makes him substantially more likely to recommit. Well, I think probably when he was first incarcerated back in 84, 85, they didn't have that type of treatment. But it has since been instituted in certain facilities. But to the best of your knowledge, this record does not reflect he was in any of those actual facilities in the department where he might have received such treatment. Your Honor, the record reflects that the expert at least said during IDOC he did not receive any such treatment. I don't believe... So up until the point that the court cares about here, the question at the time of the commitment hearing, when the commitment hearing becomes an issue, he had not received treatment in the expert size, and that was a factor weighing against him. Did he avail himself of treatment, or was there no treatment available to him? The way the expert said it, Your Honor, is that he had not availed himself of treatment. While he was convicted in 94, he was up until 2013 in IDOC. So I believe by 2013 it's well established that there were things available, treatment he could have had. And presumably the doctor, in taking that against him in not being willing to be treated, would have brought up if it was, or it would have been brought up on cross-examination if it was because there was nothing he could do. Didn't the doctor testify or conclude, I guess it would be, that pedophilic disorder is a chronic, lifelong issue that really can't be cured, period, but can't be contained or managed without some sort of treatment? Yes, Your Honor, I bet. And she described it as an inability to control urges concerning children or concerning this issue, and even with medication that might not be a successful treatment. Right, Your Honor, which goes into the explanation of the ultimate finding, that his pedophilia diagnosis is making his ability to control his actions, minimizing that, and causing him likely to offend again, as he planned. I would bring it up that the State is not arguing that they're afraid, that Respondent is going to go to Morocco and commit these actions. The State agrees it's impossible. What the State thinks the expert found relevant in relying upon it is that if someone takes that much time to plan something out like this, they want to do that. And the fact that, and it would be unreasonable to think, and the expert certainly didn't think the desire to commit these violent acts against children, this philosophy that it's good for children to sexually abuse them, is going to disappear because the Respondent can't get on a plane to Morocco, just really, at the very least, is not a correct application of the standard of taking events and the like most favorable to the State. And it's not likely he could get into a spaceship either, correct? No, Your Honor. All right. But those were things that she found or that were in his possession, according to the evidence here. Yes, Your Honor. And he did also admit, I don't believe I said, to requesting the books, although he did say that it was for a friend, that was another admission that, given the question of whether this was true or not, is relevant to the Court's discussion. How did those books for a friend get into the Department of Corrections? The list did not, Your Honor. There was a wish list that was blocked, and then there were several other books that actually got in, but the record doesn't show how they did, including basically a how-to manual for committing child pornography, another book that laid out how one can find victims online. Was the Japanese filmmaking book, handbook, was that one of the how to do pornography, or was that just a filmmaking book? I don't remember specifically the Japanese one, Your Honor. I do remember there was a book that was described as a how-to manual and included pictures of such instances and involved victims as young as what's described as a baby. All right. Okay. Justice Shostak? No. Justice Smollett? All right. Let me ask, Your Honor, that this Court affirm the judgment of the trial court. Thank you. Thank you. All right. Mr. Johnson, if you have a rebuttal at this time, you may proceed. Thank you. I have just three points. First, there's been discussion of these letters and books as being evidence, but that's not what happened at this trial. Those were not admitted into evidence. Second. So you're objecting essentially to the actual introduction of them into evidence as opposed to the fact that they were used by experts who I assume were qualified, well, they were qualified in the field, to testify about this situation. Well, I don't know if I'm objecting to it, but I just want to make sure that when we're reviewing the sufficiency of the evidence, that we review what the evidence is. And the only evidence in this case, aside from the certified statements and conviction, which we do not dispute, is the actual expert's opinions. Right. Everything else was basis of opinion, not evidence. They relied upon this. Correct. And do you dispute, I don't know if you were trial counsel, I didn't look at number or names, was there any dispute with what counsel had said here, that there were pretrial motions to try to prevent the use of these in any way because they violated his privacy? There was a pretrial motion. We did not raise that issue in the appeal, and nothing related to the pretrial hearings was introduced into evidence during the trial. Right. So I don't think that's a proper consideration in considering the sufficiency of the evidence. Okay. My recollection as far as what actually occurred during that hearing is not strong because, again, we did not raise that on the appeal. Okay. My second point is that the state said that Mr. Wall admitted to writing the letters during cross-examination. That's not so. There was only one question on this, and it said, The topic of the letters that you wrote generally did refer to sex abuse of children, correct? Answer, some did, yes. There was no specificity about any of the letters or that was it. And they had an opportunity, they had him on the stand, they could have done any number of questions that they did not do. But if he had brought a motion pretrial, to not in any way consider those documents or books or pictures or whatever he had, that seems to go a long way to, and then his argument that the state using this evidence is a violation of his privacy, that seems to go a long way to admission, doesn't it? Well, admission they were his, and that he in some way participated in them, received them, dispersed them. I don't think that that is properly raised. I don't think the state put that in their brief. I don't think they raised that in their brief. But it was in their, I can, we can take notice of the record in this case, and the representations that are related to the record. So are you saying that counsel's representation is wrong concerning what happened pretrial? There was a motion filed concerning the Illinois Department of Corrections reviewing and copying and that sort of thing. I don't remember the specifics of it because we didn't raise it in the brief, and to my recollection the state did not raise it in their brief. I would be happy to address that in some sort of post-argument motion or response to the court if that's what you would like. But, oh, I can review it right now if you want to give me a chance to do that. No, that's fine for now. We'll make that decision subsequent to this argument if necessary. The last issue that I wanted to raise was that the state said that we did not have an expert witness present any testimony. Of course, it was not Mr. Wall's burden. Thank you. Thank you. All right, thank you both for your arguments here today. We appreciate the time that you have spent with this case, and we have likewise spent time with the case and will continue to in pursuit of our decision in due course. At this time, we do stand recessed.